The next case in our call this morning is agenda number two, case number 108319, People of the State of Illinois v. Rene Amigon. Good morning, may it please the court and counsel. I'm Dena Kale on behalf of the appellant, Mr. Rene Amigon. Mr. Amigon was previously convicted of a murder and two aggravated assaults that stemmed from an incident in 1995, which was a gang-related shooting. One of the victims that was shot was paralyzed, and that was Mr. Alfonso Ruiz. When Mr. Amigon was arrested in that case, the 1995 case, he gave an in-custody statement implicating himself in that shooting. In 2001, Mr. Ruiz went to the hospital where he later died of pneumonia. In January of 2002, the state indicted Mr. Amigon, and Mr. Amigon was going to present his in-custody statement confessing to the crimes in the 2002 indictment. The defense objected, and the court, the trial court, Cook County Trial Court, admitted the statement. The objection was based on the fact that the statute had been changed and required that in murder indictments, any custodial statement had to be electronically recorded. The trial court looked at the case law and denied the motion to suppress that statement, and that statement was given into the trial testimony at the 2002 trial of the death of Mr. Ruiz. In addition to that statement being in, Mr. Ruiz's testimony at the first trial was admitted as well. And on the issue of causation, Dr. Nancy Jones, the Cook County medical examiner, presented evidence regarding the death of Mr. Ruiz from pneumonia to the gunshot wound. When Mr. Ruiz was in the hospital prior to the medical examiner receiving the body, he had donated, per consent of his family, he had donated several of his organs, and much of his immune system was harvested for the transplant matching. The immune system was not analyzed because it didn't exist, and there were no bacteria cultures done at the autopsy because the state medical examiner, Ms. Jones, Dr. Jones, did not get the body until risk of post-mortem contamination. At the close of evidence, or during the testimony of Dr. Jones, she stated that Mr. Ruiz died as a result of pneumonia. Due to quadriplegia, due to a gunshot wound. When the jury received the case and had to deliberate, one of the things they asked for was the trial transcript of the medical examiner, Dr. Jones, and the court replied that the transcript was unavailable to please continue deliberating, which they did, and they arrived at a conclusion that Dr. Jones was convicted of Mr. Ruiz's murder. The contention in the appeal is, there are actually two contentions, the one I'm going to focus on, an oral argument, has to do with a proximate cause issue, and going back to the statement, the conclusion that Dr. Jones made was that Mr. Ruiz died as a result of pneumonia due to quadriplegia. Ms. Kalei, before you even get into, I think, the bulk of your argument, as you indicated, proximate cause, just a quick question with respect to the statement. Yes. Because I want to understand your argument. There was no such requirement that the statement be recorded at the time, right? There was no, correct, in 1995, there was no requirement that custodial interrogations be electronically recorded, that is a correct statement. I mean, it's tough to fault the police for not complying with something that wasn't in effect, is that true? That is true. All right. And the second point is, and probably more importantly, the legislature provided for a two-year delayed implementation date for the statute to give police notice. So there was two years, even after the statute was passed, there was like a two-year grace period, right? That is correct. So doesn't that show without a doubt that the legislature did not intend retroactive application then? I would have to agree with Your Honor in the sense that my research on the case law, I was unable to find a case that provided for a retroactive application. Unfortunately, I did not write the PLA and I'm not pushing blame, but so I wanted to preserve the argument per my client's request, which is what I've done, but I would have to agree with your statement, Your Honor. All right. Thanks for your candor. You can proceed. Thank you. The issue on proximate cause I felt was the stronger issue in this case in the sense that because of the claim or the state's theory that the pneumonia was caused by the quadriplegia, caused by the gunshot wound, and the state claimed that quadriplegia does two things. It diminishes an individual's capacity to breathe and it compromises the immune system. The problem with the state's theory is the evidence presented, the evidence couldn't present that there was a compromised immune system because there was no immune system that was analyzed because it had been harvested for transplant matching and for organ donation. Do you know whether the organs were actually used? The lungs were not used. I do know the lungs were not used. The spleen, the rest of the immune system is generally used for matching purposes to find an appropriate donor or recipient from the donor, but the heart was used. The heart was or was not? The heart was used and there were other organs that were used that did not have to do with the immune system, but it wasn't because the immune system wasn't viable. There was no determination of whether or not the immune system was healthy. The lungs were not healthy because there was pneumonia in the lungs, so the lungs were not donated. So the state's theory that the immune system was compromised and that was an integral part of the death was that diminished capacity in breathing, doesn't allow for full pulmonary toilet, doesn't allow to expel the things in the lungs that need to be expelled so that the bacteria can grow and culture within the lungs and in this particular case it was testified at trial that Mr. Ruiz came into the hospital with an upper respiratory infection. Dr. Jones explained that upper respiratory infections could move into lower respiratory infections which are the same as pneumonia. They had no way of knowing in this particular case whether that happened because no bacteria cultures of the actual type of pneumonia were done because post-mortem contamination, the body was not received from the community hospital where Mr. Ruiz went until two days later. And so Dr. Jones said that she couldn't examine, she couldn't do a pathology report because the risk of contamination was too great. So she did prove and the defendant does concede that medical atrophy and medical wasting and quadriplegia happens as a result of the immobility of the body. The immobility of quadriplegics but she then followed that statement with because of medical wasting the immune system was compromised. But there was never any evidence presented about a compromised immune system and without that evidence and the fact that the jury requested the doctor's transcript so that they could look at her testimony to clarify perhaps some questions that they had and they weren't given it, they were speculating as to whether or not the immune system was compromised, which again was a strong part of the state's theory. It was always twofold, that diminished breathing capacity causes pneumonia and so does a compromised immune system. It was never an or issue. Isn't the question here whether at the time this initial offense was created the defendant could foresee that this was not a quadriplegic and that this victim might die of complications as a result of being rendered a quadriplegic? I agree that that is. The question is death or great bodily harm. Absolutely and the issue becomes then when does that, if we take the evidence in the light most favorable to the state and assume that even the state is not in favor of a quadriplegic scenario, Mr. Omegon is not charged with murder, he's only charged with an aggravated assault and Mr. Ruiz lives and lives to 50, 60. Perhaps Mr. Omegon is already out of jail, served his time on the aggravated assault, but he contracts pneumonia because he's quadriplegic and pneumonia due to quadriplegia due to a gunshot wound is always going to be the chain of events. So that... What about if Mr. Ruiz had gone into the hospital and he's being treated for this gunshot wound and he contracted pneumonia and died, there would be no question that he would be chargeable with murder. No question because as one of the cases points out that pneumonia after a hospital stay following a gunshot wound is a natural course of events, but the problem we have here is five, over five years had passed. Mr. Ruiz... Counsel? Yes. To examine that statement a little bit, is the time that lapses between the shooting and the death of significance generally? Generally it has not been. In this case? In this case I would argue that it is because an intervening act can break the causal connection. And if pneumonia over a period of recovery, I mean, this isn't one year, this wasn't two years, we're talking about over five years. Isn't there numerous cases that hold several years is okay? Yes, but those cases can be distinguished because the victim didn't recover. And I think you have here the time frame of five, over five years and you have recovery, whereas in those cases the length of time of recovery where perhaps five weeks was the longest recovery and then the victim ended up dying anyway. You don't have a case before you where the recovery is to this extent, where the victim is learning to drive a car equipped for quadriplegic. So he has some use of his arms. And I'm not saying that the incident isn't tragic. It is tragic. But when you have the recovery that Mr. Ruiz had and you have the fact that the state did not present evidence of a compromised immune system, which was an integral part of their theory, I think you have to question was the length of time of recovery the longest? With the type of recovery that was sustained in this case, an intervening act, and the bacteria or the pneumonia was a community acquired bacteria. That whether he was quadriplegic or not, he could have acquired and he could have died from. The medical examiner, Dr. Jones, admitted that healthy people get pneumonia and healthy people die, but that isn't the norm. Ms. Calais, isn't proximate cause something that's best left to the jury, for the finder of fact to decide? I believe it is left for the finder of fact, but in this case, the jury was unclear and they asked for clarification and they were told it wasn't available. So I mean, I guess the decision could have gone either way. They could have acquitted, but you don't have an issue as to any abuse of discretion in answering a juror's note or anything? No, no, I don't have an issue with it at all, but I think the jury struggled greatly with this issue of what do we do when there is a recovery of five and a half years and the victim is doing relatively well under the circumstances? In the Brown case, in that case, the testifying doctor could only speculate in that case was a blood clot, as to the cause of the blood clot, right? Correct. In this case, again, going to the issue of the jury having heard the evidence and making a determination as to proximate cause, there was testimony, although you don't think you don't like the testimony. Oftentimes we don't like the testimony of experts, but there was testimony that quadriplegia causes respiratory difficulty and a compromised immune system. Now, from that testimonious evidence, a rational trier of fact couldn't find, based on that evidence, that even with the five-year interlude, I mean, that evidence was certainly subject to cross-examination and everything else, couldn't they determine that it was a cause of the pneumonia? They could determine it was a cause of pneumonia, but I think what's happening then is where does the liability, so then the liability never ends in that case. Because if Mr. Ruiz had contracted pneumonia 20 years ago, he would not have been charged with a quadriplegia, but 20 years after the fact of the incident, that same analysis could be used, and I'm not sure if that analysis is justice in the sense of, for policy reasons, obviously, yes, you are correct that the evidence was presented and Dr. Jones was qualified as an expert, and I don't argue that she should not have been qualified. But I will again go back to say she was saying that the pneumonia was due to quadriplegia, and she also testified that healthy people get pneumonia. So not all quadriplegics get pneumonia, nor do quadriplegics, not all quadriplegics that get pneumonia do they die. And so I think there is some issue with the inability to examine the immune system because it didn't exist for the last 20 years. So is that anything like saying if somebody is shot and they survive, the shooting is not necessarily part of the death? No. No, I wouldn't take it that far. I think when you have an individual who has survived and he's out in the community, and we don't expect victims to live in a bubble so that they don't live their lives and they were lucky enough to survive, but at the same time, there are so many other intervening forces, and there was no history presented that Mr. Ruiz had contracted pneumonia before or that he was sickly. He was, and the testimony is that he was in usual health, despite the fact that he was quadriplegic and he was somebody who experienced medical wasting because of his quadriplegia. Was he in usual health or was he in usual health for quadriplegic? There was no clarification about that. Unfortunately, the testimony was just that Dr. Jones agreed on cross-examination that he was in fact, yes, he was in usual health, and it wasn't explored. Are you asking us to establish some kind of a time limit? No, I'm not asking for a bright line rule. I think that the factors, we go back to medical technology and that rule of the year and the day and why the rule was abolished in the first place. The rule was abolished because medical technology has advanced so much. But now we're at the other end of the spectrum where medical technology has advanced so much that I think that a look at adding, I'm asking that the, I'm asking that the rule of the year and the day be abolished. I'm asking that the intervening cause be in relation to recovery and time frame and what else the victim in the time frame between the injury and death has happened. And it's going to be a case-by-case analysis. So aren't we back to what Justice Thomas asked you a little bit ago about approximate cause analysis that's left best to the jury? It is left best to the jury, but I think that the analysis, when you look at intervening cause, I believe that one of the points I'm arguing is that part of an intervening cause could be recovery and time, that there's enough that has passed that has allowed the defendant to survive in a state of, again, recovery. He was quadriplegic, so I don't want to say normal, because I don't consider that normal. But the issue becomes pneumonia acquired when it could have been acquired by anybody who was healthy should have been determined as an, could have been determined as an intervening cause, and I think that's what the jury struggled with in the fact that they were trying to figure out if there was an intervening cause in this particular instance. Did the expert answer the specific question to a reasonable degree of medical certainty that they thought the cause or a cause of the pneumonia could have been the quadriplegia? In her opinion, yes, she answered that. She believed in her expert opinion. Isn't that basically the same as what happens in medical malpractice cases across this country, where experts divide on whether there could have been another cause or whether that was the cause, or even the expert who says that I thought it was the cause, often on cross-examination will say, yeah, there could have been other factors, but I think the cause was the quadriplegia, and then the jury is left to sort out whether, you know, who they believe. As far as the experts. But in this case, on cross-examination, the expert did admit that, and the appellate court admitted that the pneumonia was not connected to Mr. Omegon. The pneumonia, the gunshot wound was connected to Mr. Omegon, but the pneumonia itself was unrelated, but the appellate court said Mr. Omegon should have been able to foresee that the severe compromised state of the victim's body could perhaps render him to many different further injuries. And I see my red light, unless there are other questions. I would respectfully ask the court to reverse the lower court's decision. Thank you. Good morning. May it please the court. I'm Heather Farnkrog on behalf of the people of the state of Illinois. Your Honors, Alfonso Ruiz was gunned down and left for dead. The bullet that the defendant fired into his neck severed his spine, rendering him a quadriplegic. He was unable to move his body except for his biceps and his head, and he was just 17 years old. The jury heard extensive medical testimony that connected the defendant's act to the victim's quadriplegia and ultimately his death from pneumonia. The jury heard testimony that not only did the bullet wound compromise Mr. Ruiz's ability to breathe fully and deeply, but it also severely compromised his immune system. Counsel speaks that the immune system was harvested somehow for testing. The testimony was that his lymph nodes were harvested for matching purposes. His immune system was by nature his whole body. And the doctor explained how his body was compromised because he was unable to move his muscles, his muscles wasted away, his spinal cord atrophied, his brain was liquefying and slipping down into his spinal column. All of this was extensively explained to the jury, along with photographic evidence by Dr. Jones. It was also explained to the jury that the defendant's act need not be the sole cause of death, or the direct cause of death, or even the immediate cause of death, that it needed to contribute to the victim's death. And the jury heard that testimony and understood that the defendant set in motion a chain of events that ultimately led to the victim's death. And that led to him contracting pneumonia and dying of pneumonia. Dr. Jones also said that normal 22-year-olds do not die of pneumonia, that babies and the elderly die of pneumonia, and that a normal 22-year-old, that yes, people do contract pneumonia, but to die of pneumonia at age 22 was not a normal thing. As for the organs that were harvested, there were several organs that were harvested potentially for use. Counsel spoke to the heart being used. We don't know if those organs were able to be actually used when donated. There was only testimony of what was harvested and what was left in the body because of its disease state. Dr. Jones also spoke about the bacteria. This whole issue of whether it was community acquired versus hospital acquired, yes, Mr. Ruiz was out of the hospital, he was doing his best to live a life, and he contracted germs that we all encounter every single day. What type of bacteria it was really was never an issue in this case. As far as the jury being confused, all we have in the record is the jury asking for Dr. Jones' testimony. They asked once, they were told to continue to deliberate, and the jury returned a verdict in two hours. So any suggestion that the jury was somehow confused or I think her words were struggling with, struggled greatly, is completely belied by the record. It took them two hours to find defendant guilty of murder in this case. And as this court asked, foreseeability clearly is the issue here. Was it foreseeable that somebody who was shot in the neck and had their spinal cord severed and was unable to breathe would eventually contract pneumonia and be unable to fight it off because of his compromised immune system? And Dr. Jones gave extensive testimony connecting the acts of defendant to the actions of the jury. It was explained to the jury how that was foreseeable, whether it happened a year after the defendant's act or five years. Proximate cause here was proven. In the light most favorable to the prosecution, whether we proved proximate cause beyond a reasonable doubt, and this court has de novo review of that. Your Honor, if there are no other questions. Your expert says that the cause of death was pneumonia caused by the gunshot wound. Is that a de novo review of that finding a fact, or would it be manifest right? This court has de novo review, the finding causation being a question for the jury to determine whether there was proximate cause. However, the legal, ultimate legal issue is resolved by this court through de novo review. Your Honor, in conclusion, pneumonia was a natural and foreseeable consequence of the victim's quadriplegia. Viewed in the light most favorable to the prosecution, the jury's verdict here was perfectly reasonable. And we ask this court to affirm the defendant's conviction for first degree murder and his sentence. Thank you. Just briefly to clarify a couple things. The standard view is the sufficiency of the evidence and whether any rational trial or fact would be able to arrive at a conclusion. And that's a different decision than this jury arrived at. The testimony that the immune system was severely compromised was not supported by fact, because the immune system wasn't analyzed. So whether the expert's opinion that diminished breathing capacity and whether a compromised immune system is enough to have a normal 22-year-old die from pneumonia is not supported by any rational trial or fact, believe that the pneumonia was caused by the gunshot wound is what we have the contention with. Normal 22-year-olds, according to the testimony of Dr. Jones, don't die from pneumonia, and that the individuals that do die from pneumonia, she said, are those with compromised immune systems. Going right back again to the fact that she was saying that Mr. Ruiz's immune system was compromised. And again, there are no facts to support that the immune system was compromised. And then the foreseeability argument, yes, it is a huge part of the argument, but Mr. Omegon could not foresee that five and a half years later that Mr. Ruiz would die of a community-acquired bacteria pneumonia. The request in this is to reverse the conviction, and part of the reason, again, is to say that the immune system was not analyzed, and I may have misspoke about the use of the organs, but the spleen, the adrenal glands, the heart, and part of the organ transplant, and unless there are any other questions, thank you. Case number 108-319 will be taken under adjustment.